IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs June 24, 2014

## STATE OF TENNESSEE v. MARK LIPTON

**Appeal from the Circuit Court for Sevier County**
**No. 15118-II    Richard R. Vance, Judge**

_____

**No. E2012-02197-CCA-R3-CD - Filed September 4, 2014**

_____

The Defendant, Mark Lipton, was convicted by a Sevier County jury of aggravated assault and received a five-year sentence.  On appeal, the Defendant raises the following issues for our review: (1) whether the evidence was sufficient to support his conviction, citing to the inconsistencies in witnesses' testimony and to the "physical facts rule";  (2) whether the trial court erred in the admission of improper character evidence, alleging both procedural and substantive errors in that ruling; and (3) whether the trial court properly denied his petition for error coram nobis relief by concluding that the new witness's testimony was not credible.[1]  After reviewing the record and applicable authorities, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which ROBERT W. WEDEMEYER, J., joined. JOSEPH M. TIPTON, P.J., not participating.

James R. Hickman, Jr., Sevierville, Tennessee (on coram nobis petition and on appeal); and David S. Wigler, Knoxville, Tennessee (at trial), for the appellant, Mark Lipton.

Robert E. Cooper, Jr., Attorney General and Reporter; Renee W. Turner, Senior Counsel; James B. ("Jimmy") Dunn, District Attorney General; and George C. Ioannides and Ashley McDermott, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION
FACTUAL BACKGROUND

_____

[1]  For the sake of brevity, we have combined several of the issues presented by the Defendant in his appellate brief.

This case concerns the November 16, 2009 assault of Henry Sutton ("the victim") by the victim's neighbor, the Defendant, who allegedly, following a verbal altercation with the victim's grandson, pointed a gun at the victim threatening to kill him and also hit him in the face with the pistol. Thereafter, the Defendant was charged with aggravated assault for intentionally or knowingly causing the victim to reasonably fear imminent bodily by using or displaying a deadly weapon. See Tenn. Code Ann. §§ 39-13-101, -102. Prior to trial, the State moved for admission, under Tennessee Rule of Evidence 404(b), of two other acts committed by the Defendant during the November 16, 2009 episode: one, threats made by the Defendant against the victim's grandson, A.S., prior to the incident in question; and two, an assault on the victim's wife, Audry Sutton, immediately following the Defendant's assault on the victim.[2] The Defendant objected to admission of this evidence as improper character evidence, but following a hearing, the trial court allowed its admission. The Defendant proceeded to trial in March 2012.

The evidence presented at trial revealed the following facts. Officer Robert Ellingwood of the White County Sheriff's Department, who worked on this case as a police officer for the Sevier County Sheriff's Department, testified that, at approximately 4:52 p.m. on November 16, 2009, dispatch received a "fight call" off Bryan View Road and that he proceeded to that location. While en route, dispatch informed Officer Ellingwood that the altercation involved an ex-deputy and that someone had been struck by a four-wheeler. Two 911 tapes were admitted into evidence—one call from Natasha Arwood, the victim's step-daughter, and the other from the Defendant's then girlfriend, Anita Owenby.[3] These recordings portrayed two very different scenarios.

Officer Ellingwood, who had only been an officer for approximately six weeks at that time, was the first to arrive on the scene. Upon Officer Ellingwood's arrival shortly after 5:00 p.m., he observed the Defendant lying under an all-terrain vehicle or "four-wheeler." Officer Ellingwood approached the Defendant and asked him some questions in an attempt to assess the Defendant's physical state. The Defendant provided his name and stated that he had "some pain in his back." However, the Defendant told Officer Ellingwood that he was not in need of an ambulance. Officer Ellingwood testified that he did not see any visible injuries on the Defendant at that time.

Officer Ellingwood asked the Defendant what had happened. According to Officer Ellingwood, the Defendant provided the following version of events:

---

[2] It is the policy of this court to refer to minor witnesses by their initials; therefore, we will refer to the minor witness as A.S. throughout this opinion.

[3] She had married the Defendant by the time of trial.

He heard the four-wheeler outside. He went outside and approached, said that some kids were on a four-wheeler. He approached them. He said that they was [sic] riding at a high rate of speed without a helmet on the road. He stated that it was a county road and that they weren't supposed to be on the road with a four-wheeler and asked them to put it up, and he went back inside.

. . . .

He said the he went back inside. A few moments, I'm not sure exactly how much later, but heard it again. He came outside this time, he stated that an older gentleman, [the victim], was on the four-wheeler at this time, the second time.

. . . .

He stated that he approached the four-wheeler and [the victim]. He stated that when he approached [the victim], [the victim] was cussing him. Stated that [the victim] then knocked him on the ground and ran him over with a four-wheeler.

. . . .

He stated that after [the victim] ran him over [the victim] walked around the four-wheeler and picked up a large rock.

. . . .

He stated [the victim] went and picked up a rock and was going to -- standing over top of him and was going to bash his head in on the ground. He said at this time a young lady, the daughter, a daughter of [the victim] came out and stopped him at this time.

Officer Ellingwood advised the Defendant to lie still until the ambulance arrived, and the Defendant again stated that he did not need medical assistance. The Defendant's demeanor during this time, as described by Officer Ellingwood, was "[v]ery calm" although the Defendant did appear "to be in pain from his back." Officer Ellingwood saw that the Defendant's jeans had mud and dirt on them, but they did not, according to Officer Ellingwood, exhibit any tire marks.

Officer Ellingwood then went across the street to speak with the victim and several members of the Sutton family. According to Officer Ellingwood, the victim provided the following recount when asked what had happened:

[The victim] stated that the kids were riding the four-wheeler, that it had ran [sic] out of gas and they[4] were bringing it back to the house. He stated

_____

[4] Initially, the victim told Officer Ellingwood that he, A.S., and Ms. Arwood were pushing the four-wheeler
(continued...)

that [the Defendant] approached them, grabbed the front of the four-wheeler. . . . [The Defendant] grabbed the grill and stopped them. [The victim] stated that the [D]efendant was yelling and cussing at them. [The victim] had stated that the [D]efendant punched him in the face where he showed me on the left side of his face a mark. It was red like he had been struck in the face. [The victim] then stated that once [the Defendant] hit him it knocked him off the four-wheeler and he hit his leg on the front peg. [The victim] then pulled his pants leg up . . . and showed where he had a cut, a mark on his leg.

. . . .

[The victim] then stated that after he fell on the ground, the [D]efendant stood over top of him and pulled a pistol out and pointed at him over top of him.

Officer Ellingwood testified that this was "the first [he] had heard of a pistol[,]" so he returned to the Defendant and inquired about a handgun. According to Officer Ellingwood, the Defendant did not mention the weapon during their prior conversation. The Defendant confirmed at that time that he did have a handgun in the right front pocket of his pants. Officer Ellingwood retrieved the pistol and placed it in his patrol car.

Officer Ellingwood then returned to the victim and asked him to continue with "the rest of the story[.]" The victim provided the following details:

[The victim] stated that while the [D]efendant was pointing the gun at him his grandson, I believe [A.S.], was running up the road. And he stated he pointed the gun at [A.S.] And then after he pointed the gun at [A.S.] he put the gun back in his pocket and laid underneath the four-wheeler. He crawled underneath the four-wheeler.

When asked to describe the victim's demeanor, Officer Ellingwood said that the victim "seemed to stutter a lot, [was] very shook up" and "his hands were shaking[.]" Due to the victim's strained state, Officer Ellingwood had trouble extracting information from him.

Officer Ellingwood confirmed that there was a "red like" mark on the left side of the victim's face and that there was a cut on the victim's leg. Officer Ellingwood also saw a rock on the scene "in the ditch line" approximately fifteen to twenty feet from where the Defendant was lying underneath the four-wheeler.

---

[4](...continued)
back to their house when the Defendant emerged from his residence.

When the ambulance arrived on the scene, the Defendant declined medical treatment. The Defendant told the emergency medical technician that he did not have any injuries, although he claimed that "they [had] pushed the four-wheeler over him." According to Officer Ellingwood, the Defendant remained underneath the four-wheeler even after emergency medical personnel had left the scene. At some point, Detective Jeff Manis of the Sevier County Sheriff's Department helped the Defendant from underneath the four-wheeler. Det. Manis likewise did not observe any injuries on the Defendant and only saw dirt on the Defendant's jeans.

Officer Ellingwood took written statements from the victim, A.S., Ms. Arwood, Ms. Owenby, and Dana Randolph, a neighbor living on the Defendant's property. He handed each individual a piece of paper and asked them to explain what had happened. They wrote out their own statements while Officer Ellingwood performed other tasks on the scene. The statements were admitted as exhibits. Officer Ellingwood acknowledged that there were "inconsistencies between the different groups and what their statements were[.]" No arrest was made that day.

Det. Manis photographed the scene. He photographed "some dirt and some debris" on the back of the victim's shirt and on the back of the victim's neck. He also photographed the victim's face and leg. According to Det. Manis, there was a "red mark" on the victim's face, which "appeared to be where someone [had] hit him." Det. Manis agreed that it was difficult to see the extent of the mark in the photograph and stated that "it would have probably been more apparent to the naked eye than it would be in the photo." The photographs were admitted into evidence.

Criminal investigator David Hutchinson with the Sevier County District Attorney General's office testified that he visited the Suttons' residence on several occasions prior to trial. On February 15, 2012, he conducted formal interviews with A.S. and the victim. A.S. provided Inv. Hutchinson with the following details:

> [A.S.] was telling me that he had seen the gun . . . . [The Defendant] had threatened him, had stopped the boy or had his hand on him. [The Defendant] didn't pull the gun on him but he saw the gun. [The Defendant] made it clear that he had one, put it that way, is what [A.S.] indicated to me. He had a small child on there with him, a cousin or something like that, and it scared both of them and they went straight home. As he was pulling in the yard part, his papaw was coming in in the truck, and he got out and told him that [the Defendant] threatened him.
> . . . .

. . . Papaw got on the four-wheeler and drove off through the back, through the yard part that goes over to their property.

Inv. Hutchinson also spoke with the victim. According to Inv. Hutchinson, the victim said that A.S. appeared "upset and nervous" and that A.S. told the victim that he had been threatened by the Defendant. The victim confirmed to Inv. Hutchinson that he had received this information from A.S. before he returned to the Defendant's residence on the four-wheeler.

The State also presented Audry Sutton, A.S., and the victim as witnesses. They gave various accounts of the events in their respective testimony. A.S. claimed that the Defendant stopped him and his four-year-old cousin when they approached the Defendant's house on the four-wheeler. A.S. further testified that the Defendant grabbed him by the shoulder and that, as the Defendant placed his hand near his pocket, A.S. observed the butt of a gun. According to A.S., the Defendant threatened him, stating that the next time A.S. came past the Defendant's residence, he would kill A.S. A.S. said that, when he returned to his house, he was stuttering and crying and tried to inform the victim, who was "[j]ust getting out of [his] truck[,]" about the Defendant's threat. According to A.S., the victim "was sort of not understanding" him,[5] so the victim got on the four-wheeler and drove to the Defendant's house. A.S. saw that the four-wheeler's motor had died and that, as the victim bent over to fix it, the Defendant struck the victim in the head with the butt of a gun. According to A.S., the victim fell off the four-wheeler and on to the ground from the force of the hit, and once on the ground, the Defendant placed his knee in the victim's side and threatened to kill the victim. A.S. went inside and told his grandmother and aunts about the events. They proceeded to the scene and tried to move the four-wheeler back to the house. According to A.S., the Defendant got in front of the females and said, "No, this f'ing four-wheeler ain't going nowhere." A.S. said that he then saw the Defendant hit his grandmother in the chest. A.S. testified that the Defendant pulled the four-wheeler on top of himself and said, "Oops, you ran over me."

The victim testified that A.S. never informed him of the Defendant's threats. According to the victim, he rode the four-wheeler that day to check on whether a "perk test" for a sewage disposal system had been performed on a different part of his property. As he was returning from that portion of the property, the four-wheeler suddenly stopped running. The victim testified that, as he was attempting to start the four-wheeler, the Defendant hit him in the head "hard" with a pistol and knocked him to the ground. The victim said that the Defendant then placed a knee in his back, put the pistol to his head, and threatened to kill

---

[5] A.S. testified somewhat differently at the Rule 404(b) motion hearing, stating that he told the victim about the Defendant's behavior and that the victim then went to find out what had happened.

him. The victim testified that he was in fear of his life. When the victim was able to stand, he staggered around a bit and was "stunned" and "dazed" due to the force of the hit. The victim also claimed that the hit was so hard that his dentures "flew out[.]" The victim observed his wife attempt to move the four-wheeler from the road, and the Defendant responded by hitting her in the chest and then crawled underneath the four-wheeler, according to the victim. The victim denied that he ever touched the Defendant or struck him with his four-wheeler.

Ms. Sutton testified that, when her grandson returned home from a four-wheeler ride, he told her that the Defendant had stopped him and threatened him. She told him not to go near the Defendant's residence again. According to her, the victim came home approximately an hour later and went to check on "the back lot" where they were thinking of adding a mobile home. She thought that A.S. may have tried to speak with the victim before he left, but she believed that he was not able to do so. While he was gone, A.S. came inside yelling "he's hurting Papaw, he's hurting Papaw." When she and her daughter, Ms. Arwood, arrived on the scene, the victim was "staggering around" and holding his head, and the Defendant was lying in the ditch and kept saying "he hit me[] with the four-wheeler[.]" According to Ms. Sutton, the victim was dazed but was able to tell her that the Defendant hit him with a gun. She likewise claimed that the Defendant hit her in the chest as they were trying to move the four-wheeler and that he then crawled underneath it. She described that the bruise on the victim's face changed from blue to black in the following days and said that the victim still had an "imprint" on the side of his face.

The Defendant himself testified to his version of the events and presented several witnesses in an effort to corroborate his story, including his wife and his step-daughter. The Defendant and his wife claimed that it was the victim who instigated the altercation by hitting and shoving the Defendant and that the four-wheeler was pushed on top of the Defendant by the Suttons. The Defendant denied ever threatening A.S. or hitting Ms. Sutton. The Defendant further claimed that, immediately upon Officer Ellingwood's arrival, he advised him that he was carrying a weapon, despite Officer Ellingwood's testimony to the contrary. The Defendant also said that he later sought medical treatment for his injuries, receiving two shots for "soreness" in his lower back and his leg.

Based upon the foregoing, the jury found the Defendant guilty as charged. The trial court sentenced the Defendant as a Range I, standard offender to five years' incarceration, which was suspended to supervised probation.

The Defendant filed a petition for writ of error coram nobis on January 23, 2013, claiming "a newly found witness as to new information which was not and could not have been available at the trial of said cause." Attached to the petition was the affidavit of Gary

Withey, a tenant of the Defendant In the affidavit, Mr. Whitey averred that his mobile home was located near the Suttons' residence. He claimed that they were "loud neighbors," whom he could hear "talking all of the time." Mr. Whitey conveyed that he overheard the following two incidents:

> (1) That on the night of 10-19-12 at around 10:30 p.m., I went outside to smoke. While outside I noticed a group of kids drinking next to a campfire. The kids were talking loudly and I overheard [A.S.] stand up and brag about how he and his papaw lied and caused [the Defendant] to lose his job.; and (2) That on the night of 10-24-12 at around 11:00 p.m., I overheard a telephone conversation where [the victim] told [A.S.] to keep his mouth shut about the situation.

The trial court held a hearing on the petition, and Mr. Withey testified that he lived in a "twelve-foot camper" approximately 100 to 200 yards from the Defendant's residence and that the Suttons' "property line [was] about fifteen to twenty-five feet probably," so he was "[n]ot far" from the Suttons' home. He also provided a similar account of the two occurrences as that provided in his affidavit. According to Mr. Withey, he wrote down the substance of what he heard following these two incidents. A handwritten document dated October 27, 2012, was admitted as an exhibit.

On cross-examination, Mr. Withey said that, several weeks after he moved in to the Defendant's camper, the Defendant told him about the case[6] against the Suttons and warned him "to be aware of them [sic] people[.]" According to Mr. Withey, the Defendant also showed him pictures of the Suttons, warning him not to "mess with the neighbors" and to "stay away from them[.]" The Defendant did not inform Mr. Withey that he had been convicted of assaulting the victim with a firearm. When asked if he was aware of any reward, Mr. Withey stated that he had no knowledge of such at the time he came forward with this information, only learning of a possible reward "the other day" from the Defendant. Mr. Withey claimed that he had not seen the reward posters that had been posted around town. A copy of the reward poster was admitted as an exhibit.

A.S., Ms. Sutton, and the victim testified at the coram nobis hearing, denying all of Mr. Withey's claims. Ms. Sutton testified that she only recalled one campfire on her property during the relevant time period and that A.S. was not present at that event. A.S. testified, affirming that he told the truth at trial, and denying that he said he lied to get the Defendant in trouble. A.S. also denied being present for a campfire at his grandparents' property in October 2012. The victim also affirmed that he told the truth at trial and denied ever having

---

[6] Both parties had instigated civil litigation against one another.

any such phone call conversation. According to both the victim and his wife, they did not have a "landline" in the house, and the victim went to bed around 9:30 p.m., making it impossible for the victim to have been on the phone at the time Mr. Withey alleged. The Suttons' cellular telephone records for October 24, 2012, were entered as an exhibit and showed the last recorded phone call at 2:53 p.m.

At the conclusion of the hearing, the trial court denied coram nobis relief. This appeal followed.

## ANALYSIS

On appeal, the Defendant challenges (1) the sufficiency of the evidence supporting his conviction; (2) the admission of Rule 404(b) character evidence; and (3) the denial of his petition for writ of error coram nobis. We will address each in turn.

### I. Sufficiency of the Evidence

The Defendant argues that the evidence presented at trial was insufficient to support his conviction for aggravated assault. Specifically, the Defendant cites to "a multitude of internal contradictions" in the State's witnesses' testimony, noting as particularly troublesome the testimony of the A.S. and the victim. The Defendant also contends that the victim described "an extremely violent blow to the side of his face/head[,]" which description was "inconsistent with the lack of injury to his face/head," in violation of the "physical facts rule." The State responds that sufficient evidence was presented for the jury to find beyond a reasonable doubt that the Defendant was guilty of the offense and that the "physical facts rule" is inapplicable under the facts of this case.

An appellate court's standard of review when a defendant questions the sufficiency of the evidence on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). This court does not reweigh the evidence; rather, it presumes that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the State. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions regarding witness credibility, conflicts in testimony, and the weight and value to be given to evidence were resolved by the jury. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997).

A guilty verdict "removes the presumption of innocence and replaces it with a presumption of guilt, and [on appeal] the defendant has the burden of illustrating why the evidence is insufficient to support the jury's verdict." Id.; State v. Tuggle, 639 S.W.2d 913,

914 (Tenn. 1982). "This [standard] applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of [both] direct and circumstantial evidence." State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). The standard of proof is the same, whether the evidence is direct or circumstantial. State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011). Likewise, appellate review of the convicting evidence "'is the same whether the conviction is based upon direct or circumstantial evidence.'" Id. (quoting State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009)). The duty of this court "on appeal of a conviction is not to contemplate all plausible inferences in the [d]efendant's favor, but to draw all reasonable inferences from the evidence in favor of the State." State v. Sisk, 343 S.W.3d 60, 67 (Tenn. 2011).

As applicable here, aggravated assault occurs when a person intentionally or knowingly causes another to reasonably fear imminent bodily injury by using or displaying a deadly weapon. See Tenn. Code Ann. §§ 39-13-101, -102. A person acts intentionally when his conscious objective or desire is to engage in the conduct or cause the result. Tenn. Code Ann. § 39-11-106(a)(18). A person acts knowingly when he is aware of the nature of his conduct or that the circumstances exist or that he is aware that his conduct is reasonably certain to cause the result. Tenn. Code Ann. § 39-11-106(a)(20). A deadly weapon is anything made, designed, or used for the purpose of inflicting death or serious bodily injury. Tenn. Code Ann. § 39-11-106(a)(5).

The evidence, taken in a light most favorable to the State, shows that the Defendant confronted the victim following an incident between the Defendant and the victim's grandson, that the Defendant hit the victim in the head with a pistol, and that the Defendant then placed that pistol to the victim's head, threatening to kill him. The victim stated that he feared for his life. While the Defendant is correct that there are multiple conflicts in the State's witnesses' testimony, this is a classic case of credibility which falls to the province of the jury. The jury credited the State's witnesses and chose not to believe the Defendant's version of events. The evidence is sufficient to allow a rational trier of fact to conclude that the Defendant used or displayed a deadly weapon causing the victim to reasonably fear imminent bodily injury.

Additionally, the Defendant, citing the "physical facts rule," argues that the described blow to the victim's face was inconsistent with the injury observed in the photograph admitted at trial and that, therefore, the victim's testimony was "fatally flawed" and should be disregarded. The physical facts rule is "'the accepted proposition that in cases where the testimony of a witness is entirely irreconcilable with the physical evidence, the testimony can be disregarded.'" State v. Allen, 259 S.W.3d 671, 679 (Tenn. 2008) (quoting State v. Hornsby, 858 S.W.2d 892, 894 (Tenn. 1993)). When a witness's testimony "cannot possibly be true, is inherently unbelievable, or is opposed to natural laws, courts can declare the

-10-

testimony incredible as a matter of law and decline to consider it." Id. (quotation omitted). For the physical facts rule to apply, the testimony "must be unbelievable on its face, i.e., testimony as to facts or events that the witness physically could not have possibly observed or events that could not have occurred under the laws of nature." Id. at 680. For example, testimony that a witness "saw the sun set in the east" could be disregarded. Id.

The physical facts rule, however, is a power "that should be used sparingly." Hornsby, 858 S.W.2d at 895. When the testimony "is capable of different interpretations, the matter should be left for the jury to decide as the sole arbiter of credibility." Id. The determination of whether there are inconsistencies in testimony, the reconciliation of conflicts in testimony, and the determination of how this might affect a witness's credibility, are within the province of the jury. Id. "[T]he improbability of the truth of the testimony, which justifies rejection under the physical facts rule, cannot rest upon any theory involving the consideration of the comparative credibility of the witnesses." Id. at 896 (quotations omitted). The physical facts rule may not be invoked "where its application depends upon assumptions or calculations based upon estimates as to speed, distance, time, and other such uncertain matters in the movement of objects." Allen, 259 S.W.3d at 680 (quotations omitted).

The Defendant claims that the victim's testimony about the nature of the blow was incredible; however, as previously noted, determining questions of the credibility of the witnesses and inconsistencies in testimony are within the province of the jury. The victim's testimony on its face was not unbelievable, and both Officer Ellingwood and Det. Manis testified that they observed an injury to the victim's face consistent with a hit. We conclude that the physical facts rule is inapplicable here. The Defendant is not entitled to relief on this issue.

*II. Character Evidence*

The Defendant raises several challenges to the trial court's ruling on the State's motion to introduce character evidence under Rule 404(b) for "other purposes." Specifically, he contends (1) that the trial court "erred by holding a hearing and issuing a ruling on a motion which was not in the record"; (2) that the trial court "failed to sufficiently state on the record the material issue, the ruling and the reasons for admitting testimony" as to the alleged assaults on A.S. and Audry Sutton; (3) that the probative value of the evidence was not outweighed by its danger of unfair prejudice to the Defendant; and (4) that the trial court erred in giving a Rule 404(b) instruction to the jury. The State responds that the trial court properly admitted the evidence and instructed the jury accordingly.

Tennessee Rule of Evidence 404(b) provides as follows:

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait. It may, however, be admissible for other purposes. The conditions which must be satisfied before allowing such evidence are:

(1) The court upon request must hold a hearing outside the jury's presence;

(2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence;

(3) The court must find proof of the other crime, wrong, or act to be clear and convincing; and

(4) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

See also State v. Thacker, 164 S.W.3d 208, 240 (Tenn. 2005); State v. Parton, 694 S.W.2d 299, 302 (Tenn. 1985). The term "other purposes" in the aforementioned rule, permitting evidence of a defendant's prior crimes, wrongs, or acts to be admitted, has been defined to include motive, intent, guilty knowledge, identity of the defendant, absence of mistake or accident, a common scheme or plan, completion of the story, opportunity, and preparation. State v. Berry, 141 S.W.3d 549, 582 (Tenn. 2004) (citing State v. Robert Wayne Herron, No. M2002-00951-CCA-R3-CD, 2003 WL 151201, at *2 (Tenn. Crim. App. Jan. 22, 2003)).

If a trial court substantially complies with the procedural requirements of Rule 404(b), we will review the trial court's determination for an abuse of discretion. Thacker, 164 S.W.3d at 240 (citing State v. DuBose, 953 S.W.2d 649, 652 (Tenn. 1997); State v. Baker, 785 S.W.2d 132, 134 (Tenn. Crim. App. 1990)). However, if a trial court fails to substantially comply with the requirements of the rule, then the trial court's decision should be afforded no deference by the reviewing court. DuBose, 953 S.W.2d at 652.

In this case, the trial court conducted a pretrial hearing at the State's request for admission of testimony about the Defendant's threats against A.S. and about the Defendant's assault on Ms. Sutton. First, the Defendant argues for plain error relief on appeal because a written motion by the State is not contained in the technical record; thus, he contends that the trial court "erred by holding a hearing and issuing a ruling on" any Rule 404(b) motion made by the State.[7] Specifically, the Defendant submits, "As Tenn[essee] R[ule of]

_____

[7] We note that appellate counsel was substituted for trial counsel after the hearing on the motion for new trial was complete. Accordingly, the issue of a written motion, or lack thereof, was not raised in the motion

(continued...)

-12-

App[ellate] P[rocedure] 24(a) requires that 'all papers filed in the trial court' be placed in the technical record on appeal[,] then the presumption on appeal must be that no such motion was filed[,] and thus[,] the [trial c]ourt's ruling with regard [to] such a motion is plain error." The Defendant continues that he was denied his "right to full notice of any issue to be heard" and that he was substantially prejudiced by the testimony received at the motion hearing.

The record belies the Defendant's motion that no written motion was ever filed. As the State correctly points out, trial counsel, at the motion hearing, made an explicit statement indicating his receipt of such a document: "Before I address that issue, the State had also, in their notice, indicated a second incident after . . . ." The prosecutor then interrupted and detailed the second incident involving Ms. Sutton. Simply because the written document did not become a part of the technical record, as it should have, does not mean that there is a presumption on appeal that none was ever filed. Otherwise, the provisions of Tennessee Rule of Appellate Procedure 24 which provide for supplementation of the record with material "omitted from the record," "improperly included," or "misstated" therein would be meaningless. See Tenn. R. App. 24(a), (e).

The Defendant's assertion that the lack of a written motion denied him his right to be heard is incongruous with the fact that a pretrial hearing was held and testimony was received. Furthermore, the Defendant provides no authority that a written motion was required in this instance, and Rule 404 does not specifically establish such a requirement. Finally, this court has held that a pretrial hearing on a Rule 404(b) motion is not required, further alleviating the need for any written motion. See State v. Denise Diane Brannigan, No. E2011-00098-CCA-R3-CD, 2012 WL 2131111, at *9-10 (Tenn. Crim. App. June 13, 2012) (concluding that a trial court is not required to have a Rule 404(b) hearing prior to empaneling a jury and noting that Rule 404(b) motions are frequently decided on the basis of statements or arguments of counsel setting out the proposed evidence). On this ground, the Defendant's argument is devoid of any merit.

Next, the Defendant argues that the trial court did not sufficiently provide its rationale for admitting testimony regarding the assaults on A.S. and Ms. Sutton on the record. See Tenn. R. Evid. 404(b)(2). The Defendant acknowledges that the trial court did determine that material issues other than conduct conforming to a character trait existed, but he submits that the trial court failed to explain or elaborate how evidence of these two assaults accomplished the stated ends.

_____

[7](...continued)
for new trial and is, thus, waived; any relief on appeal would be via plain error review. See Tenn. R. App. P. 36(b).

-13-

The trial court held a pretrial hearing and heard testimony from A.S. A.S. provided details about the Defendant's assault on him, occurring before the Defendant's altercation with the victim, and the Defendant's assault on his grandmother, occurring after said incident involving the victim. At the conclusion of this testimony, the trial court ruled that the evidence was admissible, reasoning as follows:

> The question of the credibility of the witness would be a matter for the jury. He would be subject to cross examination . . . . You may question him about his prior statements. All those issues go to credibility. But taking the testimony that he has testified to today, it is abundantly clear that the sequence of events that this witness describes was really all part and parcel of a chain of events that link together the same time and place within minutes, that one event led to the other, that they were connected, that -- although no charges were placed, the evidence that he testified to would support additional charges. Introduction of that evidence under these circumstances in this trial would then preclude the State from charging him with those additional offenses under the -- because they could have been, they should have been, they weren't, they were tried together, heard together at the same time, the State would be barred from coming back and charging him with assault on this child, assault on the grandmother. The State has given up that option. But they are interconnected. They provide motive, they provide intent, they provide identity with respect to whether or not this defendant possessed a firearm, pointed a firearm. This witness testified to all of this. So they're intertw[in]ed and interconnected that had he been charged with assault on the young man and assault on the grandmother, they could have and should have been joined together for trial. . . . But again, they can be cross-examined, impeached as any other witness. But that's not the test of the admissibility of the evidence on the front end.

Contrary to the Defendant's assertion, the trial court, as evidenced by its statements above, did state on the record the material issues, its ruling, and the reasons for admitting the testimony about the assaults on Ms. Sutton and A.S. We note that the trial court did not make explicit findings that the evidence clearly and convincingly showed that the assaults occurred or that the probative value of the evidence outweighed its prejudicial effect, findings enumerated in Rule 404(b). However, the Defendant did not, at the hearing, and does not on appeal, contest or make a specific objection to the findings of the trial court, or lack thereof, in these regards. Rule 404(b) only requires such specific findings "upon request." See Tenn. R. Evid. 404(b)(2). Based on our review, we conclude that the trial court substantially complied with the procedural requirements of Rule 404(b), and our review is thus subject to the deferential abuse of discretion standard. See, e.g., State v. Jarvis Harris, No. W2006-02234-CCA-R3-CD, 2007 WL 2409676, at *8 (Tenn. Crim. App. Aug. 24,

2007) (determining that a finding that the probative value of the evidence outweighed the danger of unfair prejudice to the defendant was implicit in the trial court's ruling and, thus, applying the abuse of discretion standard); State v. Michael Bailey, No. W2005-01815-CCA-R3-CD, 2007 WL 763212, at *5 (Tenn. Crim. App. Mar. 13, 2007) (finding substantial compliance in the trial court's application of Rule 404(b) despite the failure to explicitly find that the proof of the other crime was clear and convincing because the finding was implicit in the trial court's explanation for allowing the challenged testimony).

As outlined above, the Defendant here was indicted for intentionally or knowingly using or displaying a deadly weapon causing another to reasonably fear imminent bodily injury. See Tenn. Code Ann. §§ 39-13-101, -102. The State's theory was that the Defendant became enraged when A.S. rode his four-wheeler, accompanied by his young cousin, past the Defendant's house, causing the Defendant to lash out at the entire Sutton family. For the purpose of establishing the intent element of aggravated assault, "'[o]ne's actions are circumstantial evidence of his intent.'" State v. Holland, 860 S.W.2d 53, 59 (Tenn. Crim. App. 1993) (quoting State v. Barker, 642 S.W.2d 735, 737 (Tenn. Crim. App. 1982)). Moreover, "it is within the authority of the jury to infer the defendant's intent . . . from surrounding facts and circumstances." State v. Brown, 311 S.W.3d 422, 432 (Tenn. 2010) (quoting State v. Lowry, 667 S.W.2d 52, 57 (Tenn.1984)); see also State v. Inlow, 52 S.W.3d 101, 105 (Tenn. Crim. App. 2000) ("Intent, which can seldom be proven by direct evidence, may be deduced or inferred by the trier of fact . . . from all the circumstances of the case in evidence."). The Defendant sought to establish that he was attacked by the Sutton family, rather than as the State suggested, that he attacked the Sutton family. Thus, the Defendant placed his intent squarely at issue.

A.S. testified that the Defendant threatened him while displaying a weapon, prior to hitting the victim with the pistol. Ms. Sutton testified that the Defendant, unprovoked, hit her in the chest as she was trying to defuse the situation and move the four-wheeler back to her residence. The evidence that the Defendant attacked A.S. and Ms. Sutton was extremely probative of the Defendant's motive, intent, and opportunity and relevant to rebut the defense theory that the Defendant was victimized by the Sutton family.

The trial court also concluded that the uncharged assaults against Ms. Sutton and A.S. were part of a single criminal episode or of the same criminal transaction. The same criminal transaction category can be described as the allowance of other criminal acts evidence to provide the "full story" of the offense for which the defendant is on trial. See Neil P. Cohen et al., Tennessee Law of Evidence, § 404[13] (6th ed. 2011). For example, a bank robber steals a car while fleeing from the bank; the car theft is admissible in the trial of the robbery to describe the whole event. Id. However, "crimes admitted as part of the 'same transaction'

should be limited to those so inextricably connected in time, place, or manner that the jury would be unable to comprehend the essential nature of the charged crime without hearing the evidence of the 'other' crime." Id. (citing cases). It is only when "exclusion of the evidence would create a chronological conceptual void" that would likely result in confusion on the material issues and "sacrifice the jury's understanding" that same criminal transaction evidence is admissible. State v. Gilliland, 22 S.W.3d 226, 272 (Tenn. 2000). The uncharged acts against A.S. and Ms. Sutton were relevant to explain what happened that day, providing the jury with the "full story."

Moreover, we hold that the probative value of this evidence is not outweighed by the danger of unfair prejudice, despite the Defendant's contention otherwise. For these reasons, we conclude that the trial court did not abuse its discretion in permitting the testimony under Rule 404(b) relative to the uncharged assaults.

Additionally, the trial court gave the jury a limiting instruction as to how to consider this evidence. See T.P.I. — Crim. 42.10. The Defendant's argument in this regard is that the evidence was not admissible and, therefore, it was error to include the instruction in the jury charge. However, because we have determined that the trial court did not abuse its discretion in admitting the challenged evidence, the instruction was properly given.

### III. Coram Nobis

On appeal, the Defendant argues that the trial court "applied an incorrect standard when denying relief at the conclusion of the coram nobis hearing[,]" placing an "extra burden" on him and his ability to secure coram nobis relief. Specifically, the Defendant points to the court's statement that the standard for relief includes "a test for whether 'the [trial] testimony was false and that the new testimony is true.'" The State replies that the trial court properly denied relief after determining that Mr. Withey was not a credible witness.

A writ of error coram nobis is an extraordinary remedy available only under very narrow and limited circumstances. State v. Mixon, 983 S.W.2d 661, 666 (Tenn. 1999). A writ of error coram nobis lies "for subsequently or newly discovered evidence relating to matters which were litigated at the trial if the judge determines that such evidence may have resulted in a different judgment, had it been presented at the trial." Tenn. Code Ann. § 40-26-105 (2006); see State v. Hart, 911 S.W.2d 371, 374 (Tenn. Crim. App. 1995). The purpose of a writ of error coram nobis "is to bring to the court's attention a previously unknown fact that, had it been known, would have resulted in a different judgment." Wilson v. State, 367 S.W.3d 229, 234-35 (Tenn. 2012). The decision to grant or deny the writ rests within the discretion of the trial court. Teague v. State, 772 S.W.2d 915, 921 (Tenn. Crim. App. 1988). "A court abuses its discretion when it applies an incorrect legal standard or its decision is illogical or unreasonable, is based on a clearly erroneous assessment of the

evidence, or utilizes reasoning that results in an injustice to the complaining party." Wilson, 367 S.W.3d at 235. Our supreme court has stated the standard of review as "whether a reasonable basis exists for concluding that had the evidence been presented at trial, the result of the proceedings might have been different." State v. Vasques, 221 S.W.3d 514, 525-28 (Tenn. 2007) (citation omitted).

Here, the trial court denied coram nobis relief, reasoning as follows:

I've listened very carefully to the testimony and the statements of counsel. I've considered the witnesses who testified, the exhibits that have been filed, the statements and arguments of counsel, the facts that were presented at trial, and from all of that the [c]ourt must conclude, first of all. The writ which the [c]ourt granted for a petition for coram nobis is an extraordinary procedure. It is intended for those circumstances where there is no other relief available, and of course newly discovered evidence, recanted testimony are the usual grounds for applying for a writ. The standard of review really has three parts.

First of all, the court trial must be reasonably assured that the testimony -- and this generally applies to recanted testimony -- but that the testimony was false and that the new statement is true. That the defendant was unable to learn about the new testimony until after the trial. Of course that's always the case where you have a recantation or newly discovered evidence. And that the defendant was unable to learn of the falsity of the testimony until after the trial. And given all that, the [c]ourt must then conclude that the jury might have reached a different conclusion if this evidence were presented to it.

This was a three-day trial. Both [the victim] and [A.S.] were cross-examined as vigorously as just about any witnesses I've ever seen. [The Defendant] had very able, experienced, very outstanding counsel representing him, brought out inconsistencies, contradictory statements, contradictory testimony by both of these witnesses throughout their testimony.

The jury was instructed, as in every case, that they were free to believe all, none or part of any witness's testimony. The jury is the finder of fact and the determiner of credibility of witnesses. But also there were other facts.

There was an independent witness, an officer who testified, whose testimony corroborated in many respects the testimony of [A.S.] His observations of the [D]efendant and his placement under the four wheeler, again, contradicted his own testimony. But through all of that, it's the jury's function to determine the facts and look at all of it together, and from that they reached their verdict, which this [c]ourt approved.

Now, it is presented that Mr. Withey had two things to tell us. First, that on October 19th, while outside his camper, he observed some teenagers drinking, partying, and overheard [A.S.] say that he had lied and gotten [the Defendant] in trouble to where he lost his job, or words to that effect. He claims that he made a note of that that night and later reduced it to further writing . . . . He then overheard, on October 24th, 2012, the [victim] talking on a cell phone outside, talking to someone, and saying words to the effect that he told [A.S.] to quit talking about -- let's see, to keep his mouth shut and stop running his mouth. Those are the two issues raised by Mr. Withey's testimony.

Now, on the other hand, we have Ms. Sutton, who testified that when they had that particular bonfire that [A.S.] wasn't there. [A.S.] says he wasn't there at that party. [The victim] says he didn't make such a phone call.

But we also have phone records, telephone records from Mr. and Mrs. Sutton, [the victim's] telephones which show that on October 24th, the certain date that Mr. Withey testified to, that on that date the last phone call recorded by either phone was at 2:53 p.m. Mr. Withey said that it was down in the evening, 10:30 or thereabouts. That totally refutes his testimony.

We also have circumstances that Mr. Withey is a tenant of [the Defendant's], lives basically on the same property. It's a little distance, but the same place, and has since last October. We have evidence that shows that reward fliers had been put out ever since the original trial offering a five thousand dollar reward for information. It's also interesting that in that time, about a year ago, apparently this is the only information that has been brought forward, despite reward posters being put out throughout the county. That the only information that's been presented here came from [the Defendant's] own tenant, who lives right next to him. Mr. Withey also said that when he first moved in, that he was shown photographs of the Suttons by [the Defendant], told to keep an eye on them. All of these things, of course, raise serious questions about his credibility.

The conversations that Mr. Withey related were nonspecific. He says he heard [A.S.] say that he lied. But in what respect? What? What particulars? What specifics? He doesn't say. Again, there's proof to the contrary that says that [A.S.] wasn't there.

Now, in reviewing all of that proof, the fact that these witnesses were extensively cross-examined and contradictions brought out, inconsistencies brought out, and the jury made a finding in view of the facts that I've just related concerning the inconsistencies today -- that is the telephone records, whether [A.S.] was even present at that bonfire or not -- in the first part of the test the [c]ourt must be satisfied that the evidence exists. I think the evidence is sparse, at best; inconclusive, and to put it kindly, inaccurate, at worst.

So in the first part where it says the trial judge must be reasonably assured that the evidence shows that the testimony at trial was false and that the new testimony is true, the [c]ourt cannot be assured of that, reasonably or otherwise, that the testimony and the evidence is unreliable. And even if it were presented at trial, the [c]ourt does not find that the jury might have reached any different conclusion. It was cumulative at the very best, if it had been available.

So for all these reasons the [c]ourt finds that the petition is not well taken, that the evidence presented is unreliable. It's contradicted by competent evidence, that is the phone records. The statements claimed were vague, without any particulars, and therefore the petition must be dismissed.

The Defendant argues that trial court applied the incorrect standard:

The [c]ourt's recitation at ruling of its decision-making rubric included a test for whether "the [trial] testimony was false and that the new testimony is true." This extra burden for the [Defendant] to prove does not appear in the statute and inappropriately challenges [the Defendant's] ability to secure statutorily-authorized relief.

Recanted testimony may qualify as newly discovered evidence and justify the granting of a writ of error coram nobis. Mixon, 983 S.W.2d at 672. Under the Mixon standard, newly discovered recanted testimony will only justify the granting of a writ of error coram nobis and a new trial if

(1) the trial court is reasonably well satisfied that the testimony given by the material witness was false and the new testimony is true; (2) the defendant was reasonably diligent in discovering the new evidence, or was surprised by the false testimony, or was unable to know of the falsity of the testimony until after trial; and (3) the jury might have reached a different conclusion had the truth been told.

Id. at 673 n.17. This court has previously held that this test is equally appropriate for newly discovered evidence of a material witness's prior statements that are inconsistent with his or her trial testimony. See William Paul Eblen v. State, No. E2012-01117-CCA-R3-CO, 2013 WL 4677619, at *6 (Tenn. Crim. App. Aug. 28, 2013) (citing State v. William Paul Eblen, No. E2002-01221-CCA-R3-CD, 2003 WL 22225636, at *10 n.3 (Tenn. Crim. App. Sept. 26, 2003)), perm. app. denied, (Tenn. Jan. 14, 2014). Thus, the trial court properly applied the Mixon standard contrary to the assertions of the Defendant.

-19-

Here, the trial court made the requisite findings and determined that it could not be reasonably satisfied that the testimony given by A.S. and the victim at trial was false and that the new testimony of Mr. Withey was true or that the jury might have reached a different conclusion had Mr. Whithey testified at trial. Mr. Withey was a tenant of the Defendant's and was warned by the Defendant to be on the lookout for the Suttons at the outset of his tenancy. A.S. and the victim denied Mr. Withey's claims that these conversations took place. Testimony from Ms. Sutton and A.S. indicated that A.S. was not present for a such a campfire. Phone records showed no phone call to or from the Suttons during the time in question. Additionally, these witnesses were vigorously cross-examined at trial. As the trial court noted, Mr. Withey's statements were vague and did not provide any particulars. Accordingly, we conclude that the trial court did not abuse its discretion in denying error coram nobis relief on the basis that the new witness was not credible.

## CONCLUSION

In sum, we conclude that the evidence is sufficient to sustain the Defendant's conviction, that the trial court did not err in admitting the Rule 404(b) character evidence, and that the denial of coram nobis was proper. Accordingly, we affirm the judgment of the trial court.

_____
D. KELLY THOMAS, JR., JUDGE